USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:   12/22/2020

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL ZITNY and BOGUSLAWA ZITNY,

Plaintiffs,

-against-

EDWARD M. MANCINI, EDWARD
MCKECHNIE, JR., and TARA MORETTI

Defendants.

No. 17 Civ. 3190 (NSR)
OPINION & ORDER

NELSON S. ROMÁN, United States District Judge

Daniel Zitny and Boguslawa Zitny (together "Plaintiffs" or "Mr. Zitny" and "Mrs. Zitny,"

respectively) commenced this diversity action to recover damages for personal injuries sustained

during a motor vehicle accident in Westchester County, New York on December 27, 2014.

Presently before the Court are three motions for summary judgment: (1) Plaintiffs move for

summary judgment on the issue of liability against all Defendants (ECF No. 46), (2) Defendant

Mancini moves for summary judgment seeking dismissal of Plaintiffs' complaint for failure of

either Plaintiff to sustain a "serious injury" under New York's No Fault Law (ECF No. 71), and

(3) Defendants McKechnie and Moretti move for summary judgment dismissing Mrs. Zitny's

claims for failure to sustain a "serious injury." (ECF No. 74.)

For the following reasons, Plaintiffs' motion is DENIED, Defendant Mancini's motion is

GRANTED as to Mrs. Zitny's claims but DENIED as to Mr. Zitny's claims, and the motion of

Defendants McKechnie and Moretti is GRANTED.

## BACKGROUND

All facts are taken from Defendant Mancini's Statement of Undisputed Facts ("Mancini

SUMF") (ECF No. 62), Defendant Mancini's Reply to Plaintiffs' Rule 56.1(B) Statement

("Mancini's SUMF Reply") (ECF No. 63), Plaintiffs' Rule 56.1(b) Statement ("Pls.' SUMF

Resp.") (ECF Nos. 70, 80), and the parties' affidavits and exhibits, and are uncontested except where indicated.[1]

## I.    The Accident

This action involves a four-car chain rear-end collision that occurred in Westchester County, New York, on December 27, 2014. The four vehicles involved are motor vehicle number 2 ("MV2"), which was owned by Plaintiffs, operated by Mr. Zitny, and occupied by Mrs. Zitny; motor vehicle number 3 ("MV3"), which was owned and operated by Defendant Mancini; motor vehicle number 4 ("MV4"), which was operated by Defendant McKechnie and owned by Defendant Moretti; and motor vehicle 1 ("MV1"), whose owner/operator is not a party to this action.

### A.    *Plaintiffs' Description of the Accident*

Plaintiffs aver that MV1 "came to an abrupt stop," so Mr. Zitny brought MV2 to a stop without coming into contact with MV1. (First M. for Summ. J., Ex. D ("Mr. Zitny Dep. Tr.") at 11, 15, 108-09 (ECF No. 46-4).) MV2 had been stopped for about four seconds when MV3 made impact with MV2 (*id.* at 10, 106; First M. for Summ. J., Ex. E ("Mrs. Zitny Dep. Tr.") at 4-5 (ECF Nos. 46-5, 82-4)), and then MV3 again impacted MV2 a couple of seconds later (Mr. Zitny Dep. Tr. at 17-19, 21, 107, 109; Mrs. Zitny Dep. Tr. at 5). Plaintiffs allege that both times MV3 came in contact with MV2, MV2 was propelled into MV1. (Pls.' SUMF Resp. ¶ 1(a); Mr. Zitny Dep. Tr. at 19-20, 25-27, 107; Mrs. Zitny Dep. Tr. at 5.) Mr. Zitny testified that the first impact was "heavy" and the second was "medium" or "moderate." (*Id.* at 18, 26.) Mr. Zitny took photos on

---

[1] The Court did not rely on Plaintiffs' Rule 56.1 Statement (ECF No. 53), Defendant Mancini's Responsive Rule 56.1 Statement (ECF No. 55), or Defendants McKechnie and Moretti's Statement of Undisputed Material Facts (ECF Nos. 67, 81) because they contained conclusory assertions without any citation to the record. *See* S.D.N.Y. Local Rule 56.1(d).

his telephone at the scene of the accident before any of the vehicles were moved. (*Id.* at 31, 95, 98-99.)

### B. Defendants' Description of the Accident

Defendant Mancini testified that "as [he] was coming around the bend, approaching where the road straightens out, [he] saw Vehicle Number 2 . . . and [he] immediately . . . braked quite hard. [His] ABS did not engage, and [he] stopped approximately two to three feet behind [MV2]. And that was a complete stop." (First M. for Summ. J., Ex. G ("Mancini Dep. Tr.") at 12 (ECF No. 46-7).) He further testified that there was a hundred and twenty-five or a hundred and fifty yards between MV1 and MV2 and that he could not see any reason why MV2 had stopped where it did and "that's why I was really nervous and I blew the horn because I knew where I stopped, anyone coming around that bend would have almost no time to stop. It was a very dangerous position where they stopped, and I have no idea why they stopped there." (*Id.* at 25.)

Defendant Mancini testified that about ten seconds after he stopped MV3 two to three feet behind MV2, he was impacted from the rear by MV4. (*Id.* at 12-13.) He further testified that the "hard" rear impact from MV4 pushed MV3 into MV2. (*Id.* at 13.) Defendant Mancini testified that after he was hit from behind

> both vehicles . . . 2 and 3 were rolling down the hill . . . . I immediately applied my brake. I had no brakes. I put the car in neutral. I then tried to start the vehicle. It didn't start. I then pulled up hard on the parking brake and I started slowing down, and Vehicle Number 2 continue to accelerate down the hill.
> . . .
> I came to a stop a few feet right behind Vehicle Number 2. It was like two feet . . . .

(*Id.* at 13-14.) Defendant Mancini testified that his vehicle, MV3, only came into contact with MV2 once. (*Id.* at 21-22.) Defendant Mancini also took photographs of the accident on his cell phone. (*Id.* at 16.)

Defendant McKechnie testified that he "came down the hill, around the turn and saw brake lights. And [he] tried [his] best to pull over to the right as far as [he] could and stop." (First M. for Summ. J., Ex. F ("McKechnie Dep. Tr.") at 12 (ECF No. 46-6).) Defendant KcKechnie further testified that MV3 was stopped before he came into contact with it and that that he did not hear any impacts before his vehicle, MV4, came into contact with MV3. (*Id.* at 25-26.)

C.    *Emergency Response and Police Report*

The parties testified that the vehicles were not moved before the police arrived about fifteen minutes after the accident occurred. (Mr. Zitny Dep. Tr. at 33, 38, 119; Mrs. Zitny Dep. Tr. at 6; McKechnie Dep. Tr. at 38; Mancini Dep. Tr. at 21.) Mr. and Mrs. Zitny and the driver of MV1 were taken from the scene of the accident to Phelps Memorial Hospital in an ambulance. (Mr. Zitny Dep. Tr. at 39, 42; First M. Summ. J., Ex H ("Police Report") (ECF No. 46-8).)

One of the officers from the scene of the accident came to the hospital and interviewed Mr. Zitny who told the officer that he was stopped in traffic when there were two rear-end impacts. (Mr. Zitny Dep. Tr. at 39.)

The police report describes the accident as follows:

Driver 1 stated he was stopped in traffic while an uninvolved vehicle made a left turn into croton gorge park. Driver 1 stated he began to start in traffic when he was struck from behind by vehicle 2. Driver 1 was towing a trailer (which was struck and had rear damage to the lift gate – trailer plate NY/BA93995) driver 1 was transported by Croton EMS to Phelps hospital for back pain. Driver 2 stated he was stopped in traffic behind vehicle 1 when he was struck from behind by vehicle 3 causing him to strike the rear of vehicle 1. Both parties from vehicle 2 were transported to Phelps hospital via Croton EMS. With neck/back/abdomen pain. Driver 3 states that he was stopped in traffic when he was struck from behind by vehicle 4 causing him to strike the rear of vehicle 2.

(Police Report.)

**II.   Injuries**

A.    *Mrs. Zitny*

4

Mrs. Zitny was deposed and testified that as a result of the accident she has anxiety, problems falling asleep, and fear of driving[2] (Mrs. Zitny Dep. Tr. at 15, 51), and that she believes that "the stress and the anxiety which came with the . . . accident prevented [her] from trying successfully conceiving later,"[3] but admitted that no doctor or medical person advised her that the accident had a negative impact on her ability to conceive a child (*id.* at 10-11). She testified that she did not have anxiety issues prior to the accident and that she was never professionally treated for anxiety or depression. (*Id.* at 16, 30.)

Mrs. Zitny saw her general practitioner for an annual checkup approximately one month after the accident. (Affidavit of Christopher J. Walsh in Support of Defendants McKechnie and Moretti's Motion for Summary Judgment ("Walsh Aff."), Ex I ("Dr. Straczynski Records") (ECF No. 82-9).) The general practitioner's notes from the February 2, 2015 visit do not mention the car accident, note that Mrs. Zitny "complains of her hormones [sic] changes – she will see her GYN to discuss options," and indicate that Mrs. Zitny "denies depression and anxiety." (*Id.* at 12, 14.)

The general practitioner's notes from Mrs. Zitny's annual physical on September 9, 2016 do not mention the accident, indicate that Mrs. Zitny "has no complaints," that "she is seeing

---

[2] Mrs. Zitny testified that she told emergency room staff that she did not have any injuries from the car accident and just wanted a pregnancy test. (Mrs. Zitny Dep. Tr. at 51; Mancini MSJ Mem, Ex. 9 ("Mrs. Zitny Phelps Hospital Records") at 13 (ECF No. 72-9); ECF No. 72-7 at 3 of 3.) She was given a pregnancy test, which came back negative. (Mrs. Zitny Phelps Hospital Records at 12-14; *see* Mrs. Zitny Dep. Tr. at 9-10, 46.)

[3] About a year before the accident, Mrs. Zitny began fertility treatments. (Mrs. Zitny Dep. Tr. at 11-13; Mr. Zitny Dep. Tr. at 151-52.) About three months before the accident, she switched to a holistic fertility treatment using herbal formulas and acupuncture because she was concerned about using hormones since her mother died of cancer when she was Mrs. Zitny's age. (Mrs. Zitny Dep. Tr. at 33-35.) Mrs. Zitny stopped the fertility treatments about a year and a half after the accident, in part because of the cost of the treatments. (Mrs. Zitny Dr. Tr. at 15, 57-58.)

OB/GYN and she is considered postmenopausal. She is tired fatigue energy is lower" (*id.* at 30),

and that she "denies depression or anxiety" (*id.* at 33).

> The general practitioner's notes from a March 5, 2018 annual physical state:

> Patient complains of having thoughts of her having cancer. She had HPV in the past. She says because of that she is getting very nervous and worrying about herself. She is having hard time to have intimate contact with her husband because of the history of HPV. She would like to see psychologist. Referral was given.

(*Id.* at 63.) The review of symptoms indicates that Mrs. Zitny "denies depression or anxiety," (*id.*

at 65), but states that Mrs. Zitny would start counseling (*id.* at 66; Mrs. Zitny Dep. Tr. at 17-19).

Defendants filed an April 18, 2018 psychiatric evaluation report from Dr. Fayer who

evaluated Mrs. Zitny and had a discussion with Mr. Zitny—no records were provided for Dr.

Fayer's review. (Walsh Aff., Ex L ("Dr. Fayer Report") (ECF No. 82-12); *see* Christopher J. Walsh

Reply Affidavit ¶ 4 (ECF No. 76); Walsh Aff. ¶ 20 (ECF No. 82).) Dr. Fayer summarized Mrs.

Zitny's history as she related it to him, including that "she was feeling well up until she was

involved in an accident," and that "she was very upset upon learning that she was not pregnant"

when she received a pregnancy test at Phelps Hospital after the accident. (Dr. Fayer Report at 1-

2.) Dr. Fayer also noted that Mrs. Zitny's mother passed away from cancer at the age of 39 and

that Mrs. Zitny believed that conventional fertility treatment "was causing damage to her body."

(*Id.* at 3.) When asked how the accident impacted her, Mrs. Zitny "said that psychologically she

had a mixture of emotions including anger, anxiety and fear. She also had sleep difficulty with

early morning awakening and reported bad dreams. For several months, she was afraid of driving,"

however, she reported that she is able to drive and that the sleep disruption and nightmares ceased

two years ago. (*Id.*)

Dr. Fayer concluded that Mrs. Zitny "has a generalized anxiety disorder manifested by

excessive worry occurring more days than not, anxiety and worry associated with restlessness,

being on edge, irritability, muscle tension and sleep disturbance" that "was exacerbated and made worse by the accident she was involved on 2/27/14."[4] (*Id*. at 5.) Dr. Fayer reported that Mrs. Zitny "described increasing anxiety, sleep disturbance, anxiety when driving for a period of at least a year after the accident." (*Id.* at 6.) Dr. Fayer stated that "[a]lthough there is no evidence that the accident itself could cause her infertility, she seems to have a persistent negative belief that this is the case." (*Id.*) Dr. Fayer opined that "Mrs. Zitny does require psychological treatment to address the anxiety, anger, and guilt she has experienced in regards to the current inability to get pregnant and the accident." (*Id.*)

Prior to and immediately following the accident, Mrs. Zitny worked as an office manager. (Mrs. Zitny Dep. Tr. at 55-56.) She continued in the same job after the accident and testified that she was able to do the work in the same manner "[b]esides the fact that [she] was not getting enough sleep and underperforming because I was coming late to work, everything was pretty much the same." (*Id.* at 56; *see* Dr. Fayer Report at 3 ("She did not miss any work following the accident.").) There were no negative repercussions for these changes. (Mrs. Zitny Dep. Tr. at 57.) She subsequently got a new, better job. (*Id.* at 56-57.)

B.      *Mr. Zitny*

1.      Care and Treatment of Mr. Zitny's Back and Neck

The Croton EMS record indicates that immediately after the accident Mr. Zitny had pain in, inter alia, his lower back and that he was transferred to Phelps Hospital on a backboard. (Mancini MSJ Mem., Ex. G ("Croton EMS Record") at 2 (ECF No. 72-7).) The records from Phelps Hospital indicate that upon arrival Mr. Zitny complained of low back pain, among other

---

[4] Mrs. Zitny had been seeing a counselor within the group her general practitioner referred her to for about three months at the time of her October 17, 2018 deposition. (Mrs. Zitny Dep. Tr. at 41.) No records from this counselor were filed.

things, and that he had a history of chronic low back pain for which he takes Motrin and sees a chiropractor. Mrs. Zitny Phelps Hospital Records" (Mancini MSJ Mem, Ex. 8 ("Mr. Zitny Phelps Hospital Records") at 8 (ECF No. 72-8).)

At Phelps Hospital, Mr. Zitny received a series of x-rays including a cervical spine x-ray, which found "[n]o evidence of fracture or dislocation of the cervical spine," and noted "disc space narrowing at the C6-7 level," and "[h]ypertrophic spurring . . . at the C4-5, C5-6 and C6-7 levels" and a lumbar spine x-ray, which found "[n]o evidence of fracture of vertebral compression," and noted "disc space narrowing with vacuum phenomenon and associated degenerative spurring at the L5-S1 level. Mild degenerative spurring is also present at the L3-4 and L4-5 levels." (Mr. Zitny Phelps Hospital Records at 26.) Mr. Zitny was released from Phelps Hospital after a few hours. (Mr. Zitny Phelps Hospital Records at 12.)

Mr. Zitny saw his general practitioner, Dr. Czepiel, on December 30, 2014 (three days after the accident). Memorandum of Law in Support of Defendant Mancini's Motion for Summary Judgment ("Mancini MSJ Mem."), Ex. J ("Dr. Czepiel Records") at 6 (ECF No. 72-10).) The notes from this visit indicate that Mr. Zitny reported "aches and pains in the upper neck the lower back" and refer to a discharge report from Phelps Hospital stating that the x-rays of the cervical and lumbar spine are normal. (*Id.*) Dr. Czepiel diagnosed in relevant part "cervical strain. Lumbar strain." (*Id.*) Dr. Czepiel recommended that Mr. Zitny see his chiropractor, Dr. Fiore, who he had been seeing for two years. (Mr. Zitny Dep. Tr. at 52-53, 137; *see* Mancini MSJ Mem., Ex. K ("Fiore Chiro. Records I") at 2-13 (ECF No. 72-11) (indicating first appointment was in January 2012).) Dr. Czepiel also gave Mr. Zitny a note for a week off work for his second job, which entailed physically stocking shelves at a grocery store. (Dr. Czepiel Records at 6.)

On March 25, 2015, Mr. Zitny had a lumbar spine MRI, ordered by his chiropractor, Dr. Fiori, which indicated a herniated disc at L5-S1. (Mancini MSJ Mem., Ex. L ("Fiore Chiro. Records II") at 49 (ECF No. 72-12).) The same day he also got an MRI scan of his cervical spine, which indicated herniated discs at C5-C6 and C6-C7, with the latter more prominent. (*Id.* at 51.)

On August 25, 2015, Mr. Zitny again visited Dr. Czepiel, complaining of "chronic low back pain." (Dr. Czepiel Records at 9.) Dr. Czepiel recommended physical therapy for the herniated discs in his neck and lumbar spine. (*Id.* at 10.) On February 1, 2016, Dr. Czepiel noted that Mr. Zitny's "neck and lumbar spine are doing much better after the chiropractic manipulations." (*Id.* at 12.)

Defendants submitted over two hundred pages of notes from Mr. Zitny's visits to his chiropractor, Dr. Fiore, which generally indicate that for two years prior to the accident beginning around January 2012, Mr. Zitny was treated for pain in his low back and neck. (Fiore Chiro. Records I.) The records generally indicate treatment for continuing back pain from the time of the accident through January 2017 and then again in July 2017 and February 2018. (Fiore Chiro. Records II.) Dr. Fiore's records indicate neck pain from the time of the accident through at least August 2015, witch chronic pain returning by April 2016 and continuing through March 2018 and interfering with Mr. Zitny's sleep and activity levels. (*Id.*)

2.    Care and Treatment of Mr. Zitny's Shoulder

The Croton EMS record for Mr. Zitny does not mention injury to Mr. Zitny's shoulder. (Croton EMS Record.) Nor do the records from Phelps Hospital. (Mr. Zitny's Phelps Hospital Records.) Dr. Czepiel's notes from the December 30, 2014 visit also do not mention injury to Mr. Zitny's shoulder. (Dr. Czepiel Records at 5-6.)

On March 25, 2015, Mr. Zitny had a left shoulder MRI, ordered by Dr. Fiore, the report for which indicates "multiple partial-thickness tears of the supraspinatus tendon" and "a SLAP lesion involving the superior labrum and the anterior and posterior labrum."[5] (*Id.* at 47-48.)

On February 1, 2016 Dr. Czepiel saw Mr. Zitny for a "complaint of chronic left shoulder pain. Dr. Czepiel reviewed the March 25, 2015 MRI." (Dr. Czepiel Records at 12.) Dr. Czepiel also conducted a physical exam noting that "[s]houlder both active and passive range of motion give him pain at about 90 degrees of abduction. Also pain at about 90 degrees of flexion and 20 degrees of extension." (*Id.* at 13.) Dr. Czepiel referred Mr. Zitny to get a second shoulder MRI due to worsening symptoms and referred him to orthopedist Dr. Karlson. (*Id.*) In a comment in Mr. Zitny's electronic patient file following the second MRI of the shoulder in February 2016, Dr. Czepiel confirmed the referral to the orthopedist, indicating "full thickness rotator cuff tear."[6] (Fiore Chiro. Records II. at 78.)

The notes from Mr. Zitny's initial appointment with Dr. Karlsson on February 15, 2016 indicate that Mr. Zitny told Dr. Karlsson that he "had no problems with his left shoulder until [the] motor vehicle accident." (Mancini MSJ Mem., Ex. M ("Edward Hospital Records") at 37 (ECF No. 72-14).) Dr. Karlsson performed shoulder surgery on March 2, 2016 at the Naperville Surgical Center. (Mancini MSJ Mem., Ex. L ("Naperville Surgical Center Records") (ECF No. 72-13).) At an appointment on September 8, 2016, Dr. Karlsson noted that "left shoulder lacks only 5 degrees

---

[5] On January 30, 2015, Mr. Zitny had an appointment with Dr. Fiore, whose notes state the session was "w/ focus to shoulder" indicating shoulders were sore from "stress at work." (Fiore Chiro. Records II at 34.) Appointment notes from multiple chiropractic appointments in February and March of 2015 indicate shoulder tightness. (*Id.* at 38-42, 46.) Records from a number of subsequent chiropractic visits during 2015 note treatment of shoulder tightness. (*Id.* at 59, 61-66, 68-72.)

[6] The MRI report indicates that Mr. Zitny reported "having a remote shoulder injury in January 2014." (Fiore Chiro. Records II. at 78.)

of overhead elevation." (Edward Hospital Records at 26.) At a follow-up appointment on October 20, 2016, Dr. Karlsson indicated that "ROM is about 90% and patient feels shoulder is still weak," and reported that Mr. Zitny had "full overhead elevation, full abduction. He lacks 2 vertebral levels on internal rotation getting to about L1 on the right and L3 on the left. He has good rotator cuff strength at the side." (Edward Hospital Records at 24-25.)

On April 25, 2017 Dr. Czepiel reexamined Mr. Zitny's shoulder, finding that range of motion of the shoulders was equal and the scar was well-healed on the left shoulder. (Dr. Czepiel Records at 16.) As of the October 17, 2018 deposition in this case, Mr. Zitny continued to have shoulder pain, usually related to activity such as light exercise or sleeping on it, but indicated that it was "tolerable pain." (Mr. Zitny Dep. Tr. at 66, 68.)

On December 11, 2018 Mr. Zitny had additional imaging of his left shoulder, including an MRI, the report for which concluded that:

> 1. Patient is status post rotator cuff repair with questionable mild tendinosis, fraying, and low-grade partial thickness undersurface tearing of the repaired supraspinatus tendon. However there is certainly no high-grade or full-thickness rotator cuff tear.
> …
> 3. labral degenerative changes with degenerative labral tearing suggested. . .

(Edward Hospital Records at 4-5.)

### 3.    Medical Evaluations of Mr. Zitny's Injuries

In support of his motion, Defendant Mancini filed the reports of two experts who provided medical opinions on Mr. Zitny's injuries: Dr. Bendis and Dr. Faierman. In opposition to Defendant Mancini's motion, Plaintiffs also filed a medical evaluation from Dr. McMahon.

#### a.  *Chiropractor Bendis*

The September 14, 2015 notarized report from Chiropractor Katherine Bendis is based on review of chiropractic and medical records and an approximately hour-long interview and physical

examination.[7] (Mancini MSJ Mem. Ex. N ("Dr. Bendis Report") at 2 (ECF No. 72-15).) As to Mr. Zitny's back and neck, Dr. Bendis' report indicates that Mr. Zitny told her that "the day after the accident he felt like he was 'punched with a hammer' in the back of the neck." (*Id.* at 4.) Dr. Bendis found "moderate, general tightness and hypertonicity along the cervical paraspinal muscles, lumbar paraspinal muscles, left pectoralis muscle, and left levator scapulae muscle" and noted that palpation of the C6-C7 and L3-L5 spinous processes elicited pain. (*Id.* at 5.)

In her physical examination, Dr. Bendis found Mr. Zitny's cervical range of motion normal (*id.*); Mr. Zitny's cervical muscular strength normal or close to normal but flexion, extension, and lateral flexion to the left produced discomfort (*id.*at 6); and the cervical orthopedic tests were negative but shoulder depression and rotation compression produced tenderness (*id.* at 7). Based on Dr. Bendis' review, the December 27, 2014 cervical x-ray showed "[d]isc space narrowing at the C6-C7 level. Hypertrophic spurring is present at the C4-C5, C5-C6, C6-C7 levels" and the March 25, 2015 MRI report of the cervical spine identifies "a small central herniated disc at C5-C6" resulting in "mild central spinal stenosis and mild bilateral neural foraminal stenosis" and a "central moderate-sized herniated disc at C6-C7" resulting in "moderate central spinal stenosis and mild bilateral foramen stenosis." (*Id.* at 9.)

Dr. Bendis found Mr. Zitny's lumbar range of motion normal as to flexion, lateral flexion, and rotation, but found that he could only extend to ten degrees as compared with the normal range of 25 degrees and noted that Mr. Zitny could reach within four inches of the floor with knees extended, "with mild difficulty." (*Id.* at 6.) She found Mr. Zitny's lumbar strength was normal but Mr. Zitny had pain in the extensors and felt pain in the low back from the hip and knee flexors.

---

[7] Dr. Bendis was only provided with records from Fiore Chiropractic beginning on January 2, 2015 and the report indicates that Mr. Zitny "began treatment with Dr. Frank Fiore, DC, on January 2, 2015." (Dr. Bendis Report at 3-4.)

(*Id.* at 7.) The lumbar orthopedic tests were positive and elicited back pain. (*Id.* at 8.) Based on Dr. Bendis' review, the December 27, 2014 lumbar x-ray showed "disc space narrowing with vacuum phenomenon and associated degenerative spurring at the L5-S1 level. Mild degenerative spurring is also present at the L3-L4 and L4-L5 levels" and the March 25, 2015 lumbar MRI report indicates "a small bulging disc at L3-L4," a "bulge of the annulus at L4-L5," a "moderate right paracentral herniated disc at L5-S1 with an annular tear resultant in moderate to severe central spinal stenosis," and "mild bilateral neural foramen stenosis with hypertrophy of the facet joints and the ligamentum flavum." (*Id.* at 9.)

Dr. Bendis also found the left shoulder range of motion was normal. (*Id.*) Mr. Zitny's shoulder strength was also normal except in the pectoralis, which measured 4/5 and elicited pain. (*Id.* at 6.) Dr. Bendis noted that three of the orthopedic tests of the left shoulder were positive and produced pain. (*Id.* at 8.) Based on Dr. Bendis' review, the March 25, 2015 MRI report for Mr. Zitny's left shoulder indicated multiple partial thickness tears, mild arthrosis of the AC joint, and a SLAP lesion involving the superior, anterior, and posterior labra. (*Id.* at 9.)

Dr. Bendis diagnosed Mr. Zitny with a neck sprain, dislocation of cervical and thoracic vertebrae, sprain of ligaments in the lumbar spine, closed dislocation of thoracic and lumbar vertebrae, dislocation of the sacroiliac joint, and muscle spasm. (*Id.* at 10.)

Dr. Bendis concluded in relevant part:

> Based on the available information, and to a reasonable degree of certainty, Mr. Zitny's neck, low back, and left shoulder pain can be attributed to the motor vehicle accident sustained on December 27, 2014. Mr. Zitny works primarily at a desk job, and has had no previous injuries to the neck and low back region. The bony structures off the MRI report and the x-ray reports indicate mild, degenerative arthritic changes and no progressive degenerative disk disease which is normal for his age group. Mr. Zitny's biceps tendon repair in 2006 resulted in no complications or pain prior to the motor vehicle action, suggesting that the left shoulder injury can be attributed to, or exacerbated by, the accident in question . . .

(*Id.* at 10.) Dr. Bendis also concluded that "continued chiropractic treatment is no longer medically necessary for Mr. Zitny in regards to the accident" but that Mr. Zitny's shoulder should be reviewed by an orthopedic specialist to determining medical necessity of surgery. (*Id.* at 11.)

Mr. Zitny reported to Dr. Bendis that he took a few days off work immediately after the accident but has since returned to full time work as an electrical engineer with no restrictions, and with a lifting restriction of forty pounds at his part-time job at a grocery store. (*Id.* at 4.) Dr. Bendis agreed that Mr. Zitny could work both as an electrical engineer and at the grocery store at full duty without restrictions. (*Id.* at 11.)

### b.  Dr. Faierman

The October 19, 2018 report of Dr. Faierman is based on review of medical records and a physical examination. (Mancini MSJ Mem., Ex. O ("Dr. Faierman Report") at 2-3 (ECF No. 72-16).) Dr. Faierman was not provided with any medical records that predated the accident. (*Id.* at 3.) Dr. Faierman's physical examination found that Mr. Zitny had full range of motion in the cervical spine (*id.* at 2), full range of motion in the lumbar spine (*id.* at 3-4), and full range of motion in the left shoulder (*id.* at 3). Dr. Faierman's physical assessment was that Mr. Zitny had (1) "recurrent lumbar spine strain with pre-existing degenerative changes," (2) "cervical spine strain with pre-existing degenerative changes," and (3) "left shoulder complaints status post arthroscopic rotator cuff repair," but indicated that all three items were "objectively resolved." (*Id.* at 3.) In summary, Dr. Faierman opined that "[i]f the history is accurate, there is a causal relationship between the accident and the injuries described by the claimant. There are no objective physical findings of any significant pathology on examination of the cervical spine, lumbar spine or bilateral shoulders. The claimant does not require further treatment as it relates to the accident[.]" (*Id.* at 4 (emphasis in original).)

14

Specifically, with respect to Mr. Zitny's lumbar spine and back, Dr. Faierman indicated that while he was aware that Mr. Zitny has a chronic history of lower back pain treated by a chiropractor and no history of neck pain, "[c]learly there is significant pre-existing degenerative changes related to the accident,"—based on "x-rays of the lumbar spine[, which] document pre-existing degenerative changes that are confirmed by the MRI report, which documents "hypertrophy of the facet joints"—and that the accident "may have aggravated" Mr. Zitny's symptoms. (*Id.*) The MRI report also identified a herniated disc at L5-S1 and Dr. Faierman stated that "it appears that this level has the most severe degenerative changes making this likely a degenerative disc." (*Id.*) Dr. Faierman stated that he would "be happy to review the MRI films to confirm [his] beliefs, but "based on the reports [he] had to review [he did] not believe there is any new traumatic pathology in the lumbar spine related to the accident of 12/27/14." (*Id.*)

With respect to Mr. Zitny's cervical spine and neck, Dr. Faierman reported that the x-ray from the ER revealed pre-existing "hypertropic spurring at C4/5, C5/6 and C6/7 levels" which are also reported in the MRI report and that "[b]ased on the reports [Dr. Faierman] had to review [he] believe[s] the disc herniations are likely related to degenerative changes" and that he did not "believe there is any objective evidence of traumatic pathology related to the accident" (*Id.*) He again stated that he "would be happy to review the MRI films to confim [his] beliefs." (*Id.*)

Finally, with respect to Mr. Zitny's shoulder, Dr. Faierman observed that the initial left shoulder MRI "documents only a 50% partial thickness tear," which "is extremely common in claimants of his age," and that the full thickness tear appeared in the report for the second MRI, "thirteen months after the accident." (*Id.*) Dr. Faierman opined that the fact that Mr. Zitny did not complain of shoulder pains until months after the accident is "inconsistent with a traumatic injury to the shoulder." (*Id.*) Dr. Faierman further stated that "[w]hether [the rotator cuff tear] in any way

related to the accident of 12/27/14 cannot be ascertained without reviewing the MRI films. Based on the medical records is appears unlikely that the rotator cuff tear is related to the accident of 12/27/14. . . If MRI films and operative photographs become available, I would be happy to review them." (*Id.* at 4-5.)

### c.  Dr. McMahon

The April 16, 2018 report of Dr. McMahon is based at least on a physical examination. (Pls.' Opp'n Mem., Ex. 5 ("Dr. McMahon Report") (ECF No. 79-5).) It is not clear which, if any, medical records Dr. McMahon reviewed. (*Id.*) With respect to Mr. Zitny's shoulder, Dr. McMahon reported normal range of motion for elevation and external rotation, however, Mr. Zitny could only internally rotate to L2 and normal would be T10. (*Id.* at 4.) With respect to Mr. Zitny's cervical spine, Dr. McMahon identified flexion of 45 degrees compared with a normal range of 50 degrees and bending to the right with pain to 30 degrees compared with a normal range of 40 degrees. (*Id.* at 4-5.) Dr. McMahon observed that the extension and ability to bend to the right were within the normal range of motion. (*Id.*) With respect to Mr. Zitny's lumbar spine, Dr. McMahon identified tenderness to palpation but normal ranges of motion. Dr. McMahon made three diagnoses: (1) left-shoulder full thickness rotator cut tear, (2) cervical spine C5-6 small herniated disc and C6-7 moderate herniated disc, and (3) lumbar spine L3-4 and L4-5 disc bulges and L5-S1 moderate herniated disc with an annular tear and moderate to severe spinal canal stenosis. (*Id.* at 5.) With respect to causation, Dr. McMahon stated "[t]he above diagnoses occurred as a result of the motor vehicle accident . . . . The patient had chronic back pain prior to the accident." (*Id.*)

Dr. McMahon reported a prognosis of "poor" in that Mr. Zitny's condition is permanent where over three years after the accident, Mr. Zitny "remains symptomatic to the point where he

continues taking Motrin 800" and "[h]is condition interferes with his quality of life, his activities of daily living and his ability to work as an electrical engineer." Dr. McMahon indicated that Mr. Zitny would benefit from additional procedures to the shoulder, cervical spine, and lumbar spine that he estimated to cost $125,000. (*Id.* at 6.)

### *4.*     Mr. Zitny's Testimony Regarding His Injuries

Mr. Zitny testified that prior to the accident he had never injured his shoulder and that he has not injured it since, it has just never healed. (*Id.* at 62-63.) Mr. Zitny testified that since the accident and the injury to his shoulder he has been unable to continue his normal workouts and activities and is limited to certain exercises and using "considerably" lighter weights at the gym. (*Id.* at 68-71,73-75.)

Mr. Zitny testified that prior to and for some time after the accident he worked as an electrical engineer and draftsman and that he had to miss a few days of work after the accident and a few days of work after his shoulder surgery. (*Id.* at 76-77.) He also testified that his work had to be "limited in scope" during the period when he wore a sling after his shoulder surgery. (*Id.* at 78.) His duties and salary did not decrease after the accident. (*Id.* at 78, 134-36.) In January of 2018 he began working for a new company as a project manager and has never missed any work there as a result of the injuries claimed from the accident. (*Id.* at 79-80, 136.)

### III.   Procedural History

Plaintiffs commenced this action on May 1, 2017. (("Complaint") (ECF No. 1).) On July 2, 2017 Defendants McKechnie and Moretti answered the complaint and asserted cross-claims against Defendant Mancini. (ECF No. 14.) Defendant Mancini subsequently answered the complaint and the cross-claims. (ECF Nos. 16, 17, respectively.) At a status conference on June 21, 2019, the Court granted Plaintiffs leave to move for summary judgment. The Court

subsequently granted Defendant Mancini and Defendants McKechnie and Moretti leave to cross-move for summary judgment. (ECF No. 50.) All three summary judgment motions are now before the Court.

## LEGAL STANDARDS

### I.    Summary Judgment

Under Federal Rule of Civil Procedure 56(c), summary judgment shall be granted if "there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 n. 4 (1986). "[G]enuineness runs to whether disputed factual issues can reasonably be resolved in favor of either party, [while] materiality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." *Mitchell v. Washingtonville Cent. Sch. Dist.,* 190 F.3d 1, 5 (2d Cir. 1999) (internal quotations and citations omitted). In order to prove that a genuine issue of material fact exists, a plaintiff "may not rest upon the mere allegations or denials of the pleading[s]," but must by affidavit or otherwise "set forth specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e). "Conclusory statements, conjecture or speculation by the party resisting the motion will not defeat summary judgment." *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

Courts must resolve all ambiguities and draw all reasonable factual inferences in favor of the non-moving party. *See Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). The moving party bears the initial burden of demonstrating an absence of genuine issues of material fact. *See Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997). If the initial burden is met, the non-moving party "must produce specific facts indicating that a genuine issue of fact exists. If the evidence [presented by the non-moving party] is merely colorable, or is

not significantly probative, summary judgment may be granted*.*" *Scotto v. Almenas*, 143 F.3d 105, 114 (2d Cir. 1998) (internal quotations and citations omitted) (alteration in original).

## II.     New York Negligence Law

"[B]ecause a federal court sitting in diversity applies the law of the forum state and because New York is the state where the tort occurred[,]" New York law governs Plaintiffs' negligence claims. *Velez v. Sebeo Laundry Systems, Inc.*, 178 F. Supp. 2d 336, 339 (S.D.N.Y. 2001) (citing *Klaxon v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 80 (1938); *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996)); *see also Yi Fu Chen*, 2015 WL 3953532, at * 1 n.3 (applying New York law in a diversity action alleging negligence arising out of a rear-end collision that took place in New York).

"'Under New York law, . . . a plaintiff must establish three elements to prevail on a negligence claim: (1) the existence of a duty on defendant's part as to plaintiff; (2) a breach of this duty; and (3) injury to the plaintiff as a result thereof.'" *Aegis Ins. Services. Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 177 (2d. Cir. 2013) (quoting *Alfaro v. Wal-Mart Stores, Inc.*, 210 F.3d 111, 114 (2d Cir. 2000)).

Motor vehicle operators are required to maintain safe distances between their cars and cars in front of them (Vehicle and Traffic Law § 1129[a]) and this rule imposes a duty to be aware of traffic conditions, including vehicle stoppages. *Johnson v. Phillips*, 261 A.D.2d 269, 271 (1st Dept 1999) (citing *Sass v. Ambu Trans Inc.*, 238 A.D.2d 570, 570 (2d Dept 1997)). "It is well established law that a rear-end collision with a stopped vehicle establishes a prima facie case of negligence on part of the driver of the second vehicle*.*" *Polonia v. Dunphy*, No. 11 Civ. 1563 (CM), 2012 WL 2376467, at *3 (S.D.N.Y. June 21, 2012). "A defendant can overcome the presumption of negligence by providing a non-negligent explanation for the collision," *see Krynski v. Chase*, 707 F. Supp. 2d 318, 322 (E.D.N.Y. 2009), such as "mechanical failure, unavoidable skidding on wet

pavement, or a sudden stop of the vehicle ahead," *Power v. Hupart*, 260 A.D.2d 458 (2d Dept 1999), or "[e]vidence that a vehicle was struck in the rear and propelled into the vehicle in front of it," *Pomerantsev v. Kodinsky*, 156 A.D.3d 656, 657 (2d Dept 2017). Similarly, "[i]n a chain collision accident, the operator of the middle vehicle may establish prima facie entitlement to judgment as a matter of law by demonstrating that the middle vehicle was properly stopped behind the lead vehicle when it was struck from behind by the rear vehicle and propelled into the lead vehicle" *Chuk Hwa Shin v. Correale*, 142 A.D.3d 518, 519 (2d Dept 2016); *accord Niosi v. Jones*, 133 A.D.3d 578, 579 (2d Dept 2015).

### III.    New York No Fault Insurance Law

New York's No Fault Law states that there shall be no right of recovery for non-economic losses arising out of negligence in the use or operation of an automobile except in the case of a "serious injury." N.Y. Ins. Law § 5104(a). This law was enacted "to remove the vast majority of claims arising from vehicular accidents from the sphere of common-law tort litigation, and to establish a quick, sure and efficient system for obtaining compensation for economic loss suffered as a result of such accidents." *Walton v. Lumbermens Mut. Cas. Co.*, 88 N.Y.2d 211, 214 (1996).

New York's No Fault law defines nine types of "serious injury" that qualify for recovery, two of which are relevant here: "permanent consequential limitation of use of a body organ or member" and "significant limitation of use of a body function or system." N.Y. Ins. Law § 5102(d). "Whether an injury is permanent is usually a medical question beyond the knowledge of a lay jury." *Dufel v. Green*, 85 N.Y.2d 795, 797 (1994). "Whether a limitation of use or function is 'significant' or 'consequential' (i.e., important) relates to medical significance and involves a comparative determination of the degree or qualitative nature of an injury based on the normal function, purpose and use of the body part." *Id.*

A defendant moving for summary judgment in cases governed by New York's No-Fault Law "must establish a prima facie case that plaintiff did not sustain a 'serious injury' within the meaning of Insurance Law § 5102(d)." *Yong Qin Luo v. Mikel*, 625 F.3d 772, 777 (2d Cir. 2010) (quoting *Barth v. Harris*, 00 Civ. 1658 (CM), 2001 WL 736802, at \*2 (S.D.N.Y. June 25, 2001)). A defendant can establish the lack of serious injury by using plaintiff's own unsworn medical records, and otherwise inadmissible medical reports from plaintiff's own doctors. *Newton v. Drayton*, 305 A.D.2d 303 (1st Dept 2003). A defendant can also use plaintiff's own sworn testimony to establish the absence of a serious injury. *Arjona v. Calcano*, 7 A.D.3d 279 (1st Dept 2004); *Nelson v. Distant*, 308 A.D.2d 338 (1st Dept 2003).

Once a defendant has established a prima facie case that plaintiff did not sustain a "serious injury," "a plaintiff is required to present competent, non-conclusory expert evidence sufficient to support a finding, not only that the alleged injury is 'serious' within the meaning of Insurance Law § 5102(d), but also that the injury was proximately caused by the accident at issue." *Carter v. Full Serv., Inc.*, 29 A.D.3d 342, 44 (1st Dept 2006). A plaintiff's medical evidence, when proffered to establish the existence of a serious injury, must be in admissible form. *Grasso v. Angerami*, 79 N.Y.2d 813 (1991). "As long as the plaintiff adduces sufficient objective evidence from which a jury could find that she sustained a serious injury, [a defendant's motion for] summary judgment must be denied 'notwithstanding some contrary probative evidence.'" *Rivera*, 2012 WL 3132667, at \*10 (quoting *Nasrallah v. Helio De*, 1998 WL 152568, at \*8 (S.D.N.Y. Apr. 2, 1998)).

## DISCUSSION[8]

Plaintiffs move for summary judgment against all Defendants on the issue of liability. In essence, Plaintiffs assert they did not contribute to the causing of the accident. Defendant Mancini counters that there is a dispute of material fact regarding his liability that precludes summary judgment and moves the Court to dismiss Plaintiffs claims because neither Mr. nor Mrs. Zitny's alleged injuries qualify as a serious injury as defined by New York's No Fault Law. Defendants McKechnie and Moretti also move for summary judgment dismissing Mrs. Zitny's claims. The Court will address each issue in turn beginning with liability.

## I.      Liability

Plaintiffs seek summary judgment on the issue of liability asserting that Defendants' negligence resulted in their injuries. Defendant Mancini opposes on the ground that there is a dispute of material fact—whether his vehicle, MV3, came into contact with Plaintiffs' vehicle, MV2, before MV3 was hit from the rear by MV4—that precludes summary judgment on liability.[9]

Plaintiffs aver that MV3 struck MV2 two separate times, providing in support their own testimony and statements prepared by others to whom the Zitnys indicated that there had been two impacts. (*E.g.* Zitny Dep. Tr. at 17-19, 21, 107, 109; Mrs. Zitny Dep. Tr. at 5; Police Report; *see*

---

[8] This court has jurisdiction over this matter under 28 U.S.C. § 1332(a)(2) because the accident at issue occurred in New York, Plaintiffs are citizens of Illinois (Complaint ¶¶ 7, 8), Defendant Mancini is citizen of Connecticut (*id.* ¶ 2), and Defendants McKechnie and Moretti are citizens of New York (ECF no. 15); and the complaint seeks over $75,000 in damages (Complaint ¶ 13). *See Scherer v. Equitable Life Assurance Soc'y of U.S.*, 347 F.3d 394, 397 (2d Cir. 2003) (recognizing rebuttable presumption that face of complaint is a good faith representation of citizenship and amount in controversy).

[9] Defendants McKechnie and Moretti do not directly oppose Plaintiffs' motion, arguing only that (1) the police report upon which Plaintiffs rely is not certified and is therefore inadmissible, and (2) even if the Court were to find defendants liable, Plaintiffs will still need to establish "serious injury" in order to recover damages. (ECF No. 49.)

Pls.' Mem. in Supp. at 6 (ECF No. 46).) The Zitnys' evidence is contradicted by Defendant Mancini's testimony that he brought MV3 to a complete stop two to three feet behind MV3 and was stopped for about ten seconds before MV4 hit MV3, propelling MV3 into MV2. (Mancini Dep. Tr. at 13-14, 21-22.) It is also called into question by Defendant McKechnie's testimony that he did not know what occurred before MV4 hit MV3 but that he did not hear any impact prior to MV4 making impact with MV3. (McKechnie Dep. Tr. at 26.)

Accordingly, there is a dispute of material fact as to whether MV3 made contact with MV2 before MV4 propelled MV3 into MV2. If there was a single impact between MV3 and MV2, then MV3 only hit MV2 after MV3 had come to a complete stop and was propelled into MV2 by MV4, relieving Defendant Mancini of liability. If, however, there were two impacts, then arguably MV3 rear-ended MV2, and MV3 was subsequently caused to be propelled into MV2, after MV3 was struck from behind by MV4. Because there is a dispute of material fact as to the number of rear-end impacts sustained by MV2, the vehicle occupied by Plaintiffs, the Court is unable to determine as a matter of law whether Defendants McKechnie and Moretti are solely liable or whether Defendant Mancini is contributorily negligent, the granting of summary judgment must be denied. *See, e.g.*, *Kuris v. El Sol Contracting & Const. Corp.*, 116 A.D.3d 675, 676 (2d Dept 2014) (reversing grant of summary judgment where there was a dispute over whether defendant driver's vehicle had been struck in the rear by an unidentified vehicle causing his vehicle to move forward and strike the rear of the plaintiff's vehicle).

## II.   Serious Injury

The Complaint does not specify to which of the categories of "serious injury" under § 5102(d) Plaintiffs' alleged injuries pertain, stating only that both Mr. and Mrs. Zitny "believe[] [their] injuries are permanent and that [they] will permanently suffer from the effects of the . . . injuries and that [they] will be caused to suffer pain, suffering, significant limitations and

consequential limitations of use of the affected body parts; and disruption of [their] pre—accident li[ves]." (Complaint ¶¶ 90, 94.) Defendant Mancini avers that Plaintiffs' case should be dismissed because Plaintiffs "fail to set forth the categories of 'serious injury' that they allege they qualify under." (Mancini Opp'n Mem. at 26 (ECF No. 72).) While a court may not consider qualification for a category of serious injury that is not alleged in the complaint, *e.g.*, *Lee v. Laird,* 66 A.D.3d 1302, 1303 (3d Dept 2009); *Robinson v. Schiavoni*, 249 A.D.2d 991, 992 (4th Dept 1998), by claiming that their injuries are "permanent" and have resulted in "significant" and "consequential" limitations, the Zitnys have sufficiently invoked two of the categories of serious injury set forth in § 5102(d), "permanent consequential limitation of use of a body organ or member" and "significant limitation of use of a body function or system." Accordingly, the Court will only consider whether Plaintiffs can survive summary judgment for serious injury under those two categories.

All Defendants move for summary judgment seeking dismissal of Mrs. Zitny's claims on the basis that she has failed to provide objective evidence of "serious injury" resulting from the accident. Defendant Mancini also seeks summary judgment dismissal of Mr. Zitny's claims on the basis that he did not sustain a "serious injury" because the chain of causation between the accident and the claimed injuries was interrupted by pre-existing and degenerative conditions in the back and shoulder,  and delayed treatment of the shoulder. The Court will address each Plaintiff's case in turn beginning with Mrs. Zitny.

### A.    *Mrs. Zitny*

Defendants Mancini, McKechnie, and Moretti assert Mrs. Zitny's claims should be dismissed because she is unable to demonstrate that she suffered a "serious injury" as a result of the accident. Specifically, Defendant Mancini argues even if the Court assumes that the relevant categories are (a) permanent consequential limitation and (b) significant limitation, Mrs. Zitny's

complaints of "serious injury" are entirely subjective and therefore she is unable to met the threshold burden.[10] (Mancini Opp'n Mem.) Defendant Mancini further argues that to the extent Mrs. Zitny claims that the accident aggravated her pre-existing anxiety, it fails as a matter of law because even the report of Dr. Fayer does not contain objective evidence of injury that has caused a permanent or consequential disability or limitation causally related to the accident. (Mancini Reply Mem (ECF No. 73).)

Defendants McKechnie and Morretti argue that the only injury Mrs. Zitny asserts is an inability to conceive a child, which she attributes to stress and anxiety caused by the accident. (M & M Mem. in Support (ECF No. 78); M & M Reply Mem. (ECF No. 77).) They claim that Defendants have made a prima facie case that Mrs. Zitny did not suffer serious injury, which she has failed to rebut, where the medical records demonstrate that (1) Mrs. Zitny did not express any feelings of depression or anxiety attributable to the accident to her general doctor who she saw at least three times after the accident; rather, nearly three years after the accident Mrs. Zitny sought a referral to a psychologist because she had concerns regarding cancer and difficulty with intimacy with her husband due to her medical history with HPV; (2) Mrs. Zitny conceded at her deposition that (a) no doctor has told her that stress from the accident could be related to her inability to conceive, and (b) prior to the accident Mrs. Zitny had switched from hormone-based fertility treatments to holistic medicine because she feared contracting cancer because her mother had died from cancer when she was the same age as Mrs. Zitny was around the time of the accident; and (3) Dr. Fayer's conclusion that Mrs. Zitny has generalized anxiety exacerbated by the accident does not support a finding of a causal connection between a serious injury and the accident where

---

[10] Defendant Mancini also suggests that an additional category of serious injury—the 90/180 standard—may apply; however, as the Court has already indicated, the Complaint only seems to invoke permanent consequential limitation and significant limitation.

Dr. Fayer reviewed no medical records and admitted that there was no evidence the accident could have caused her infertility and that Mrs. Zitny did not miss work after the accident and continued to drive. (*Id.*)

"Although a causally-related emotional injury, alone or in combination with a physical injury, can constitute a serious injury within the meaning of Insurance Law § 5102(d), such injury must be serious and verifiable, and must also be established by objective medical evidence." *Kranis v. Biederbeck*, 83 A.D.3d 903, 903 (2d Dept 2011). "An expert's qualitative assessment of a plaintiff's condition . . . may suffice, provided that the evaluation has an objective basis and compares the plaintiff's limitations to the normal function, purpose and use of the affected . . . function or system." *Toure v. Avis Rent A Car Sys., Inc.*, 98 N.Y.2d 345, 350 (2002) (emphasis omitted). In other words, emotional injury "may be demonstrated without diagnostic testing for purposes of Insurance Law § 5102(d) by symptoms objectively observed by treating physicians and established by the testimony of the injured plaintiff and others who observe the plaintiff." *Krivit v. Pitula*, 79 A.D.3d 1432, 1434 (3d Dept 2010). However, a Plaintiff's subjective complaints alone do not suffice. *See, e.g.*, *Gootz v. Kelly,* 140 A.D.2d 874, 874 (3d Dept 1988) (holding plaintiff's subjective complaints of pain, with no substantiating credible medical evidence, insufficient to establish a serious injury under New York's no fault law); *Costa v. Billingsley*, 127 A.D.2d 990, 990 (4th Dept 1987) (holding that subjective complaints without objective medical findings by plaintiff's treating physician insufficient to establish prima facie case of serious injury, in the face of defendant's expert testimony that plaintiff did not have serious injury); *see also Kang v. Romeo*, No. 18CV4033ARRSMG, 2020 WL 4738947, at *8 (E.D.N.Y. Aug. 14, 2020) ("[A] plaintiff's self-serving and conclusory statements regarding causation are insufficient to raise a triable issue of fact if not corroborated

by objective medical evidence[.]"); *Evans v. United States*, 978 F. Supp. 2d 148, 166 (E.D.N.Y. 2013) ("the Plaintiff's claims of depression and 'low energy levels' are not supported by objective medical evidence. Indeed, the Plaintiff admitted that he did not seek medical treatment for his depression or 'low energy'").

Here, Defendants' contention that Mrs. Zitny did not suffer serious emotional injury from the accident is supported by three types of evidence. First, it is supported by records from Mrs. Zitny's general practitioner who saw Mrs. Zitny for at least three annual physical exams after the accident and consistently noted each time that Mrs. Zitny "denies anxiety and depression." (Dr. Straczynski Records 14, 33, 65.) The general practitioner's notes do not mention the accident and when the general practitioner referred Mrs. Zitny to a psychologist, the notes indicate that the referral was given because

> Patient complains of having thoughts of her having cancer. She had HPV in the past. She says because of that she is getting very nervous and worrying about herself. She is having hard time to have intimate contact with her husband because of the history of HPV. She would like to see psychologist.

(*Id.* at 63.) Thus, it is clear that the notes do not attribute the psychological referral to the accident. Second, Mrs. Zitny testified that she became anxious due to her concern for contracting cancer through fertility medications because her mother died of cancer. She also testified that she never missed work following the accident and was able to resume driving after the accident. Finally, Dr. Fayer's report does not prove either causation or degree of injury where Dr. Fayer reviewed no medical records and conceded that there was no evidence the accident could have caused Mrs. Zitny's infertility.

In rebuttal, Mrs. Zitny offers only the report of Dr. Fayer (Plfs. Opp'n Mem. ¶¶ 22-26), which is insufficient to sustain her burden for at least three reasons. First, it is entirely based on the statements of Mr. and Mrs. Zitny as Dr. Fayer does not appear to have been provided with any

of Mrs. Zitny's medical records. *See Burke v. Carney*, 37 A.D.3d 1107, 1108 (4th Dept 2007) (criticizing use of physician's opinion that "was based largely on plaintiff's subjective complaints of pain"). Second, even if Mrs. Zitny does have "generalized anxiety," Dr. Fayer did not describe that anxiety as having a "significant" or "consequential" effect on Mrs. Zitny where he did not compare Mrs. Zitny's limitation to normal function. *Palmeri v. Zurn*, 55 A.D.3d 1017, 1019 (3d Dept 2008) ("plaintiffs' proof fell short of demonstrating that any injury—physical or psychological—constituted a significant limitation [where] no physician quantified any alleged physical and/or psychological loss or limitation or provided a qualitative comparison of plaintiff's condition to normal function"). Finally, Dr. Fayer's report does not support a causal connection between Mrs. Zitny's injuries and the accident where it not only concedes that there is no evidence the accident caused Mrs. Zitny's infertility, it suggests other sources for Mrs. Zitny's anxiety including that the anxiety resulted from the negative pregnancy test after the accident rather than the accident itself, Mrs. Zitny's HPV diagnosis, and her mother's death from cancer.

Accordingly, the Court finds that Defendants have established a prima facie case that Mrs. Zitny did not suffer serious injury from the accident, which Mrs. Zitny has failed to rebut, and therefore grants Defendants' motions as to Mrs. Zitny's claims. *See Taranto v. McCaffrey*,40 A.D.3d 626, 627 (2d Dept 2007) (affirming summary judgment order for defendant where "any psychological condition or depression suffered by the plaintiff was found by the defendants' doctors to be unrelated to the automobile accident, especially in light of the existence of other life stressors and the passage of more than two years prior to the diagnosis of the psychological impairments").

### B.    Mr. Zitny

Defendant Mancini moves for summary judgment dismissing Mr. Zitny's claims on the basis that (1) Mr. Zitny has failed to prove causation where he has pre-existing injuries or

conditions involving his back, neck, and shoulder—the same parts of his body to which he claims injury from the accident, and (2) the medical records document a gap in treatment between the accident and Mr. Zitny's complaints and treatment for his left shoulder injury.

The New York Court of Appeals has held "even where there is objective medical proof, when additional contributory factors interrupt the chain of causation between the accident and claimed injury—such as a gap in treatment, an intervening medical problem or a preexisting condition—summary dismissal of the complaint may be appropriate." *Pommells v. Perez*, 4 N.Y.3d 566, 572 (2005). The Court will address pre-existing condition and then gap in treatment.

### 1.   Pre-existing Conditions

In support of his claim that Mr. Zitny's injuries are all attributable to pre-existing or degenerative conditions rather than the accident, Defendant Mancini relies on (1) Dr. Faierman's report, and (2) pre-accident medical records from Fiore Chiropractic.

In order to recover under the No Fault Law, a plaintiff must prove serious injury resulting from the subject accident. "For a pre-existing condition to interrupt the chain of causation between the accident and claimed injury, the current injury must be attributable to the pre-existing condition." *Perpall v. Pavetek Corp.*, No. 12-CV-0336 (PKC), 2017 WL 1155764, at *21 (E.D.N.Y. Mar. 27, 2017) (internal quotation marks omitted). Evidence that the subject injury exacerbated an underlying injury or caused an underlying condition is sufficient to raise an issue of fact as to causation. *See, e.g.*, *Ortiz v. Boamah*, 169 A.D.3d 486, 488 (1st Dept 2019) ("An explanation that the plaintiff was previously asymptomatic and the accident aggravated an underlying pre-existing condition, rendering the plaintiff symptomatic, is sufficient to raise an issue of fact as to causation."); *Rabinowitz v. Kahl*, 78 A.D.3d 678, 678 (2d Dept 2010) (holding that defendant failed to make a prima facie case where defense expert "concluded that the plaintiff

29

may have suffered from an aggravation of preexisting degenerative disc disease in her cervical and lumbar spine," and plaintiff had alleged "in her bill of particulars that the subject accident aggravated and/or exacerbated preexisting degenerative conditions in her cervical and lumbar regions"); *Gentile v. Snook,* 20 A.D.3d 389, 389 (2d Dept 2005) (holding that defendant failed to make a prima facie case where "defendant's expert . . . acknowledged that the subject accident might have caused an exacerbation of the plaintiff's pre-existing degenerative pathology").

Here, Dr. Faierman was provided only with the MRI reports and not the MRI films themselves. As to each of his conclusions, he states that the MRI report "likely" indicates an underlying or degenerative condition and that he "would be happy to review the MRI films to confirm [his] beliefs, but based on the reports [he] had to review [he] did not believe there is any new traumatic pathology" in the lumbar spine, cervical spine, or left shoulder. In other words, based on the records Dr. Faierman was provided, he could not determine the extent to which Mr. Zitny's injuries were attributable to the accident. *See Ayach v. Ghazal*, 25 A.D.3d 742, 743-44 (2d Dept 2006) (holding that defendant did not make a prima facie case where defendants' orthopedist stated that based upon the information he had been given he could not determine what symptoms related to the accident and what symptoms were pre-existing); *see also Glynn v. Hopkins*, 55 A.D.3d 498, 498 (1st Dept 2008) ("defendant's radiologist's statement that 'there are underlying degenerative changes suggesting that [a small central disk herniation at C4–C5] may be chronic in nature' is too equivocal to satisfy defendant's prima facie burden to show that such herniation was not caused by a traumatic event"); *Harman v. Busch*, 37 A.D.3d 537, 538 (2d Dept 2007) (holding that defendant did not make a prima facie case where expert found that "the injured plaintiff sustained traumatic aggravation of those prior conditions and noted unquantified or unqualified limitations in the range of motion of the injured plaintiff's cervical spine . . . suggest[ing] that the

traumatic aggravation to those pre-existing conditions caused by the subject accident was also a contributory factor in the limitations in cervical spine range of motion observed by him and noted in his report").

To the extent that Defendant Mancini argues that pre-accident records from Fiore Chiropractic indicate that prior to the accident Mr. Zitny had some complaints and/or treatment to the neck, back, or shoulder, such evidence is insufficient where neither Dr. Bendis nor Dr. Faierman were provided with these pre-accident chiropractic records and therefore there is no objective medical evidence that Mr. Zitny's post-accident complaints were the same as or caused solely by pre-accident conditions.[11] *Perpall,* 2017 WL 1155764, at *21 ("[I]t is not enough for Defendants to simply show that Perpall has been treated for headaches and neck and back pain in the past. Defendants must also show—and not just assert in a conclusory manner—that Perpall's current condition was caused by those pre-existing injuries rather than by the 2010 accident.") Accordingly, the Court finds that Defendant Mancini has failed to demonstrate the lack of a material issue of fact that Mr. Zitny's injuries were exclusively pre-existing or degenerative conditions, and not are causally related to the accident.

---

[11] Defendant Mancini filed Dr. Bendis' report in support of his motion for summary judgment but did not refer to it in his brief. Nevertheless, despite noting that the lumbar and cervical spine x-rays taken on the date of the accident and the reports for the lumbar and cervical spine MRIs taken on March 25, 2015 indicated degenerative conditions, and nonetheless concluded that "[b]ased on the available information, and to a reasonable degree of certainty, Mr. Zitny's neck, low back, and left shoulder pain can be attributed to the motor vehicle accident." (Dr. Bendis Report at 9-10.) Dr. Bendis' opinion provides further support that Defendant Mancini has not made a prima facie case that Mr. Zitny's injuries resulted from degenerative and pre-existing conditions rather than the accident.

2.      Gap in Treatment

Defendant Mancini's contention that Mr. Zitny's delay in seeking treatment for his

shoulder injury breaks the chain of causation is based on "the fact that Daniel Zitny did not treat

for his left shoulder complaints until approximately 14 months after the subject accident."

(Mancini MSJ Mem. at 29, 33.) However, that contention is belied by the record. While it is true

that Mr. Zitny did not see Dr. Karlsson until over a year after the accident, he had his first shoulder

MRI on March 25, 2015 following multiple complaints to his chiropractor regarding increasing

pain. Additionally, numerous records from visits to Fiore Chiropractic throughout 2015 mention

shoulder complaints.[12] The fact that Mr. Zitny sought to treat his shoulder injury with his

chiropractor rather than by going immediately to an orthopedist does not in and of itself break the

chain of causation. *See Ortiz*, 169 A.D.3d at 489 (rejecting gap in treatment argument where

"Plaintiff sought continuous, albeit different modalities of treatment since the accident, including

chiropractic care for four years following her surgery. She continued to take over-the-counter

medication throughout, and sought intervention only as the pain increased."); *see also Wenegieme*

*v. Harriott*, 157 A.D.3d 412, 412 (1st Dept 2018) ("Plaintiff's gap in treatment is not dispositive,

as she explained that, after 11 months of therapy, her physician told her any

further treatment would be palliative in nature. Moreover, her physician stated that her condition

remained persistent throughout treatment."). Accordingly, Defendant Mancini has not adduced

---

[12] To the extent Dr. Faierman's opinion that the accident did not cause Mr. Zitny's shoulder injury because the second shoulder MRI indicated a full thickness tear whereas the first MRI indicated only a partial thickness tear, the persuasiveness of Dr. Faierman's opinion is limited by his own admission that "[w]hether [the rotator cuff tear] is in any way related to the accident of 12/27/14 cannot be ascertained without reviewing the MRI films." (Dr. Faierman Report at 4.)

persuasive evidence that the course of Mr. Zitny's treatment for his shoulder injury amounts to a gap in treatment that breaks the chain of causation.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for summary judgment is DENIED on the basis that there is a genuine dispute as to a material fact concerning liability as between the Defendants; Defendants McKechnie and Moretti's motion seeking summary judgment as against Mrs. Zitny for failure to sustain a serious injury is GRANTED; and Defendant Mancini's motion for summary judgment for failure to sustain a serious injury is GRANTED as to Mrs. Zitny's Claims and DENIED as to Mr. Zitny's claims.

The Clerk of Court is directed to terminate the motions at ECF Nos. 46, 71, 74. The Clerk of Court is also directed to terminate Mrs. Zitny as a party in this case.

Mr. Zitny and the Defendants are directed to appear for a telephonic pre-trial conference on February 25, 2021 at 2:00 pm. To access the telephonic pre-trial conference, please follow these instructions: (1) Dial the meeting number: (877) 336-1839; (2) enter the Access Code: 1231334#; (3) press pound (#) to enter the conference as a guest.


Dated:    December 22, 2020                                    SO ORDERED:
          White Plains, New York

                                        _____
                                             NELSON S. ROMÁN
                                           United States District Judge